UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRIAN PEIXOTO, | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 16-cv-10428-DJC |
| LOIS A. RUSSO, et al., | ) ) ) |
| Defendants. | ) ) |

MEMORANDUM AND ORDER

**CASPER, J.**                                                                                       December 22, 2016

**I.    Introduction**

Plaintiff Brian Peixoto ("Peixoto") brings this lawsuit against Lois A. Russo ("Russo"), the superintendent of the Massachusetts Correctional Institution in Concord, Massachusetts ("MCI-Concord");[1] Mark Smith ("Smith"), the inner parameter security sergeant at MCI-Concord; and Marcelo Silva ("Silva"), the institutional grievance coordinator at MCI-Concord (collectively, the "Defendants"). D. 1 ¶¶ 2-5. Peixoto brings claims under 42 U.S.C. § 1983 ("§ 1983"), the Massachusetts Civil Rights Act, Mass. Gen. L. c. 12, § 11I ("MCRA") and Mass. Gen. L. c. 265, § 37 by the Defendants in their individual and official capacities. D. 1 ¶¶ 1, 72-80.[2] Pursuant to

---

[1] Russo has since retired but at all times relevant to this action was the superintendent of MCI-Concord. D. 1 ¶ 3; D. 15 at 1 n.1.

[2] To the extent that Peixoto's complaint raises an MCRA claim against Silva, D. 1 ¶ 80, his subsequent filings, D. 19 at 1; D. 20 at 12, 15 n.4, as well as his counsel's statements at the motion hearing, D. 23, clarify that he is not pursuing such a claim against Silva.

1

Fed. R. Civ. P. 12(b)(6), the Defendants have moved to dismiss all claims. D. 14. For the reasons set forth below, the Court ALLOWS IN PART and DENIES IN PART the Defendants' motion.

## II.     Standard of Review

To survive a motion to dismiss, a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In determining whether a plaintiff has met this burden, the Court must first "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Then the Court must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Id. at 55 (emphasis omitted). Ultimately, in determining whether the complaint "crosses the plausibility threshold," the Court must draw on its "judicial experience and common sense." García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (internal quotation mark and citation omitted). Because this is a context-specific inquiry, the allegations within the complaint need not have "a high degree of factual specificity." Id. (quoting Grajales v. P.R. Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012)).

Furthermore, in deciding a motion to dismiss, the Court may consider documents that are "attached to or fairly incorporated into the complaint," Schatz, 669 F.3d at 55 (internal quotation marks and citation omitted), as well as "documents central to [the] plaintiff['s] claim[s]," "the authenticity of which are not disputed by the parties," Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009) (internal quotation mark and citation omitted).

**III.     Factual Background**

The following is based upon the allegations set forth in Peixoto's complaint, D. 1, which the Court must accept as true for the purpose of considering Defendants' motion to dismiss, D. 14.

Peixoto is a prisoner under the care and custody of the Massachusetts Department of Correction ("DOC") and is currently incarcerated at MCI-Concord.  D. 1 ¶ 2.  On May 8, 2014, after undergoing an extensive screening process, id. ¶¶ 9-12, Peixoto was accepted into the National Education for Assistance Dogs Services Prison PUP Program ("NEADS Program"), id. ¶¶ 6, 13, a rehabilitative program in which fifteen DOC inmates are entrusted with raising, caring for and training service dogs to be placed with disabled individuals, id. ¶¶ 6 n.2, 7.  Inmates who participate in the program are given certain privileges not available through other DOC programs: (1) housing in a "smaller, quieter, less restrictive program unit"; (2) residence in "the only single cells in the facility"; (3) the ability to remain outside of their prison cells for up to five additional hours a day; (4) ten days a month of "good-time" (for inmates with eligible sentences); and (5) ten dollars a week in compensation.  Id. ¶ 8.  Through the NEADS Program, Peixoto successful trained three dogs who were placed with disabled individuals and, due to his performance in the program, was promoted to the position of "Primary Dog Handler."  Id. ¶¶ 14, 43, 48-49.

On August 25, 2015, Peixoto was contacted by Gus Garcia-Roberts ("Garcia-Roberts"), a reporter who was interested in writing a feature story for Boston Magazine about Peixoto's alleged wrongful criminal conviction.  Id. ¶ 15.  Peixoto agreed to be interviewed by Garcia-Roberts for the feature story.  Id.  On November 3, 2015, the DOC Central Office granted Garcia-Roberts's request for permission to enter MCI-Concord on November 16, 2015 to interview Peixoto.  Id. ¶ 20.  On November 6, 2015, in anticipation of the upcoming interview, Garcia-Roberts began conducting preliminary phone interviews with Peixoto.  Id. ¶ 21.  These conversations were recorded by the MCI-Concord phone system.  Id.

3

On November 10, 2015, after normal business hours, Smith called Peixoto into the inner parameter security office and then led him to an isolated room where he proceeded to question Peixoto regarding his upcoming media interview. Id. ¶¶ 22-24. Uncomfortable with Smith's line of questioning, Peixoto informed Smith that he was determined to participate in the interview and that any further questions regarding the interview should be addressed to his attorney. Id. ¶ 25. Angered by Peixoto's response, Smith warned him that participating in the interview would put his position in the NEADS Program "at risk." Id. ¶ 26.

On November 12, 2015, Russo revoked Garcia-Roberts's permission to conduct the interview with Peixoto on November 16, 2015. Id. ¶ 30. In response, Garcia-Roberts immediately contacted the DOC Central Office to report Russo's cancellation of the interview and, the next day, the DOC Central Office overruled the cancellation. Id. ¶¶ 31-32. The same day as the MDOC Central Office's ruling, Russo revoked Peixoto's permission—which he had been given long before—to keep and play his guitar in his cell to practice for religious service performances. Id. ¶¶ 33-34. Pursuant to Russo's orders, the property sergeant confiscated Peixoto's guitar. Id. ¶ 35.

On November 16, 2015, Garcia-Roberts, accompanied by a photographer for Boston Magazine, interviewed and photographed Peixoto. Id. ¶¶ 38-40. On February 8, 2016, Boston Magazine published a feature article about Peixoto's alleged wrongful criminal conviction, his romantic relationship with a former DOC employee—who was caught bringing a cellphone into prison—and the alleged abuses he suffered while under the care and custody of the DOC. Id. ¶ 41; D. 15-1.

On February 10, 2016, Peixoto completed training the dog he had been raising for the past fifteen months and the dog was placed with a disabled child. D. 1 ¶ 42. As such, on February 22, 2016, the NEADS Program liaison informed Peixoto that in two days he would be entrusted with

a new puppy to train over the next eighteen to twenty-four months. Id. ¶ 45. A day later, however, the NEADS Program liaison informed Peixoto that, pursuant to orders from the DOC's administration, Peixoto had been removed from the NEADS Program, effective immediately. Id. ¶ 46. Peixoto was thus removed from his single cell in the NEADS Program unit and placed in a two-man cell in a larger unit. Id. ¶ 47.

On March 4, 2016, Peixoto submitted a written appeal of his removal from the NEADS Program to Russo. Id. ¶ 57; D. 1-1 at 12-13. Russo never responded to this appeal. D. 1 ¶ 58. On March 18, 2016, Peixoto submitted DOC Inmate Grievance 87563 to Silva, claiming that Russo's decision to remove Peixoto from the NEADS Program two weeks after the publication of the Boston Magazine article was "arbitrary, retaliatory, and punitive punishment." Id. ¶ 61; see D. 1-1 at 14-16. On April 5, 2016, Silva denied Peixoto's grievance, finding that his claim had "no basis in fact" and that his removal was permissible under a work assignment policy. D. 1 ¶ 62; see D. 1-1 at 17. On April 18, 2016, Peixoto appealed Silva's denial of his grievance to Russo. Id. ¶ 64. On April 20, 2016, Russo denied the appeal. Id. ¶ 65; D 1-1 at 18.

**IV.    Procedural History**

Peixoto brought this action against Defendants on July 25, 2016. D. 1. Defendants moved to dismiss for failure to state a claim for relief on October 5, 2016. D. 14. The Court heard the parties on the pending motion on December 1, 2016 and took the matter under advisement. D. 23.

**V.    Discussion**

    **A.    Section 1983 Claims**

        *1.    As Against Russo and Smith*

Peixoto claims that Russo and Smith retaliated against him for participating in the interview for Boston magazine. D. 1 ¶¶ 41, 72-75. Specifically, Peixoto claims that, as a result of his

agreeing to be interviewed, Russo ordered Smith to intimidate Peixoto and to threaten him with removal from the NEADS Program if he participated in the interview, id. ¶ 73, that Smith did intimidate and threaten him, id. ¶ 74, and, when such tactics proved ineffective, Russo cancelled the pre-approved interview, id. ¶ 75.  Peixoto further claims that, as a result of his participation in the interview, Russo ordered the confiscation of his guitar, his removal from the NEADS Program and the loss of all privileges associated with the program.  Id. ¶¶ 77-78.

To succeed on a retaliation claim under § 1983, an inmate must prove:  (1) "he engaged in constitutionally protected conduct"; (2) "prison officials took adverse action against him"; (3) "with the intent to retaliate against him for engaging in the constitutionally protected conduct"; and (4) "he would not have suffered the adverse action 'but for' the prison officials' retaliatory motive."  Schofield v. Clarke, 769 F. Supp. 2d 42, 46-47 (D. Mass. 2011) (citing Partelow v. Massachusetts, 442 F. Supp. 2d 41, 51 (D. Mass. 2006)); see McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979).  In assessing such a claim, courts must use "particular care because virtually any adverse action taken against a prisoner by a prison official . . . can be characterized as a constitutionally proscribed retaliatory act."  Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks and citation omitted).  The First Circuit has specifically cautioned that "[b]ecause prisoner retaliation claims are easily fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, courts must insist that such claims are bound up in facts, not in the gossamer strands of speculation and surmise."  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011) (internal quotation marks and citation omitted).  Even then, "a motion to dismiss is not the place to resolve factual disagreements and make credibility determinations."  Goldman v. Masucci, No. CA 10-064 S, 2011 WL 884717, at *2 (D.R.I. Mar. 11, 2011).

As to the first element, Peixoto has alleged sufficient facts from which a reasonable jury could infer that "he [was] engaged in constitutionally protected conduct" by communicating with reporter Garcia-Roberts.  It is well established that an inmate retains his "First Amendment right to communicate with the media."  McMann v. Cent. Falls Det. Facility Corp., No. 13-cv-570 ML, 2013 WL 5565507, at *5 (D.R.I. Oct. 8, 2013); McMillan v. Carlson, 369 F. Supp. 1182, 1186 (D. Mass. 1973) (acknowledging that "a prisoner's claimed right of communication with the press . . . is firmly established"), aff'd, 493 F.2d 1217 (1st Cir. 1974).  Peixoto alleges that he was engaged in repeated communications with Garcia-Roberts regarding his personal views on the penal justice system as applied to his particular case.  D. 1 ¶ 15, 21, 29, 38-41.  These communications, as alleged, sufficiently implicate Peixoto's First Amendment right to freedom of speech.[3]

In arguing for dismissal, Defendants rely upon cases which have upheld "reasonable regulation with respect to media interviews" of inmates.  D. 15 at 7-8; see, e.g., Hatch v. Lappin, 660 F. Supp. 2d 104, 110 (D. Mass. 2009) (denying habeas petition challenging revocation of home confinement for violation of certain prison regulations regarding communications with the media); see also Pell v. Procunier, 417 U.S. 817 (1974) (upholding a regulation which prohibited inmates from engaging in face-to-face interviews with media personnel); Shaw v. Murphy, 532 U.S. 223, 229 (2001) (noting that the Supreme Court has "generally . . . deferred to the judgments of prison officials in upholding [such] regulations against constitutional challenge").  Such cases are inapposite here where Peixoto is not challenging any DOC or MCI-Concord regulations regarding inmate communications with the media but rather contends that, despite complying with

---

[3] Defendants argue that an inmate does not have a constitutional right to participate in a particular rehabilitative program such that Peixoto's retaliation claims fail as to the first element.  See D. 15 at 4-6.  Peixoto's retaliation claim, however, is based upon his First Amendment rights, D. 20 at 7-9.

the applicable prison regulations, he was retaliated against for communicating with reporter Garcia-Roberts.  D. 20 at 7-9.  Likewise, Defendants rely upon several cases suggesting that media personnel do not have a constitutional right to communicate with inmates.  D. 15 at 7-8; e.g., Pell, 417 U.S. at 834; Houchins v. KQED, Inc., 438 U.S. 1, 16 (1978).  Such cases, however, do not cut against the well-established principle that inmates themselves have a constitutional right to communicate with the media.  McMann, 2013 WL 5565507, at *5; McMillan, 369 F. Supp. at 1186.

As to the second element, Peixoto has sufficiently alleged at this stage that "prison officials took adverse action against him" by, among others, removing him from the NEADS Program. Although a *de minimis* adverse action is insufficient to establish liability under § 1983, an adverse action "is *not de minimis* if it would chill or silence a person of ordinary firmness from future First Amendment activities."  Pope v. Bernard, No. 10-1443, 2011 WL 478055, at *2 (1st Cir. Feb. 10, 2011) (per curiam) (unpublished) (internal quotation marks and citation omitted).  Where a plaintiff alleges multiple adverse actions, courts consider the cumulative effect of such actions in determining whether they are more than *de minimis*.  See Ayotte v. Barnhart, 973 F. Supp. 2d 70, 94 (D. Me. 2013).  A reasonable jury could find that the cumulative effect of the adverse actions Peixoto alleges, including confiscation of personal property and removal from the NEADS Program which he was involved in for a substantial period of time, D. 1 ¶¶ 14, 22-27, 33-35, 43, 46-49, would deter an inmate of "ordinary firmness" from engaging in communications with the media.

As to the third and fourth elements, a reasonable jury could infer from the sequence and temporal proximity of the events alleged—for instance, Peixoto's removal from the NEADS Program two weeks after the Boston magazine article was published—that Russo and Smith had

the intent to retaliate against Peixoto for exercising his constitutional right to communicate with the media and that "but for" this intent, Peixoto would not have suffered an adverse action. See Hudson v. MacEachern, 94 F. Supp. 3d 59, 68 (D. Mass. 2015) (explaining that "[a]t the motion to dismiss stage, intent . . . can be inferred from a 'chronology of events which may support an inference of retaliation'" (quoting Schofield, 769 F. Supp. 2d at 47)); accord Ferranti v. Moran, 618 F.2d 888, 892 (1st Cir. 1980).

As such, Peixoto has stated a plausible § 1983 retaliation claim against Russo and Smith.

### 2. *As Against Silva*

Peixoto also asserts a § 1983 claim against Silva for failing to provide Peixoto with a remedy through the institutional grievance process for Russo's and Smith's allegedly retaliatory actions. D. 1 ¶¶ 61-63, 80. To bring such a § 1983 claim, Peixoto must allege that Silva, acting under color of state law, deprived him of his "rights, privileges or immunities secured by the constitution." See Mattei v. Dunbar, No. 13-cv-12195-FDS, 2015 WL 926044, at *6 (D. Mass. Mar. 4, 2015) (quoting § 1983) (internal quotation marks omitted). The denial of Peixoto's grievance due to the inadequacy of Silva's investigation, D. 1 ¶ 63 (alleging that contrary to established policy, Silva failed to interview both Peixoto and the NEADS Program liaisons regarding the conduct alleged in the grievance), or otherwise, cannot serve as the basis for his § 1983 claim where "the Constitution does not create a liberty interest in, or other right to, access to a prison grievance procedure," see Mattei, 2015 WL 926044, at *6 (citations omitted); see also Moseley v. Spencer, No. 15-cv-13661-LTS, 2016 WL 347305, at *5 (D. Mass. Jan. 27, 2016) (recognizing that "[w]hen the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance") (internal quotation marks and citation omitted)).

9

To the extent that Peixoto raises a § 1983 retaliation claim based upon Silva's denial of his grievance, Peixoto does not allege sufficient facts to raise a plausible inference that Silva had a retaliatory motive or that such motive was a "but for" cause of his denial of the grievance. See Schofield, 769 F. Supp. 2d at 46-47. The temporal proximity between Peixoto's assertion of his First Amendment right to communicate with the media in November 2015 and Silva's denial of Peixoto's grievance in April 2016 is less than the proximity alleged as to the other defendants and he has not alleged sufficient facts from which a jury could infer that Silva was somehow acting in concert with Russo and Smith such that their alleged retaliatory intent implies a retaliatory intent by him. Indeed, there are no allegations to suggest that Silva had any knowledge of Russo's and Smith's actions prior to Peixoto's filing of his grievance or that Silva in any way communicated with Russo or Smith regarding their conduct subsequent to receiving the grievance. See Murphy v. Corizon, No. 12-cv-00101-JAW, 2012 WL 3637902, at *8 (D. Me. July 6, 2012), report and recommendation adopted, No. 12-cv-00101-JAW, 2012 WL 3637897 (D. Me. Aug. 22, 2012).

For all of these reasons, Peixoto has failed to state a plausible claim for relief under § 1983 against Silva.

**B.** **Massachusetts Civil Rights Act Claims**

*1.     As Against Smith*

Peixoto brings MCRA claims against Smith where he allegedly questioned Peixoto in an isolated room after normal business hours and out of the presence of other corrections personnel regarding his upcoming interview with Garcia-Roberts and that during such questioning Smith strongly indicated that Peixoto should not go forward with the interview. D.1 ¶ 14, 22-26, 43, 48-49, 74. Peixoto further alleges that Smith threatened him with removal from the NEADS Program should he do so. Id.

To succeed on a MCRA claim, a plaintiff must show that: (1) "his exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth of Massachusetts (2) has been interfered with, or attempted to be interfered with, . . . (3) by threats, intimidation or coercion." Farrah ex rel. Estate of Santana v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass. 2010); see Johnson v. Ryan, 2016 WL 2585676, at *2 (Mass. App. Ct. May 5, 2016) (unpublished). For MCRA purposes, a "threat" is "intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" is "putting [a person] in fear for the purpose of compelling or deterring [his] conduct"; and "coercion" is "application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994). "Massachusetts courts apply an objective reasonable person standard to determine whether conduct constitute[s] threats, intimidation, or coercion." Spencer v. Roche, 755 F. Supp. 2d 250, 265 (D. Mass. 2010), aff'd, 659 F.3d 142 (1st Cir. 2011) (internal quotation marks and citation omitted). Critically, a plaintiff cannot rely on the same conduct "as both the constitutional violation and the evidence of threats, intimidation, or coercion" to establish a violation of the MCRA. Santiago v. Keyes, 890 F. Supp. 2d 149, 159 (D. Mass. 2012).

As previously discussed, Peixoto has sufficiently pled that Smith acted with the intent to deter Peixoto from exercising his constitutional right to communicate with the media. Furthermore, Peixoto has alleged facts which, at the very least, raise a triable inference that Smith's questioning regarding the media interview amounted to intimidation within the meaning of the MCRA. In light of the unusual circumstances in which Peixoto alleges such questioning occurred, D. 1 ¶¶ 22-27, as well as Peixoto's sudden termination of the questioning, id. ¶ 25, a reasonable jury could infer that Peixoto experienced substantial discomfort during such questioning which

amounted to fear.  Even if Peixoto himself did not experience fear in these circumstances, his allegations at this stage are such that an "objective reasonable person" may have experienced fear. Spencer, 755 F. Supp. 2d at 265.  Despite Defendants' suggestions, D. 15 at 10, that Peixoto ultimately participated in the media interview does not doom his MCRA claim because it is sufficient for MCRA purposes to allege that Defendants "attempted to . . . interfere[] with" Peixoto's First Amendment rights, Farrah, 725 F. Supp. 2d at 247.

As such, Peixoto has stated a plausible claim for relief under the MCRA against Smith.

### 2. As Against Russo

Peixoto claims that, to deter him from participating in the interview with Garcia-Roberts, Russo ordered Smith to engage in the above-mentioned conduct in violation of the MCRA.  D. 73.

To establish supervisory liability for a violation of the MCRA, a plaintiff must show that: (1) the defendant was a "supervisor"; (2) the behavior of one of the defendant's subordinates resulted in a civil rights violation; and (3) the defendant's action or inaction was "affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008) (alterations in original) (internal quotation mark and citation omitted) (discussing supervisory liability under § 1983); see Xian Ming Wu v. City of New Bedford, No. 12-cv-11648-RWZ, 2013 WL 4858473, at *2 n.1 (D. Mass. Sept. 11, 2013) (explaining that "[t]he standard for supervisory liability under the MCRA is . . . the same as under § 1983").

Here, Peixoto has pled facts from which a reasonable jury could infer that, at all relevant times, Russo was acting as Smith's supervisor.  See D. 1 ¶¶ 3-5 (noting that Russo was the "Superintendent" and "Chief Executive Officer" of the facility while Smith was one of several

sergeants); id. ¶ 24 (alleging that Smith explicitly told Peixoto that his actions were "by order of . . . Russo"). As previously discussed, there is at least a question of fact as to whether Smith's conduct resulted in a violation of Peixoto's civil rights as established by § 1983. Smith's statement to Peixoto that Russo ordered his conduct, if taken as true, raises a triable inference of "supervisory encouragement" of such conduct.

Thus, Peixoto has stated a plausible claim for relief under the MCRA against Russo.

### C. Mass. Gen. L. c. 265, § 37

While not explicitly raised in the complaint, to the extent that Peixoto is attempting to bring a claim under Mass. Gen. L. c. 265, § 37 by reference to such statute in the "jurisdiction" section of his complaint, D. 1 ¶ 1, that statute is a criminal statute[4] and provides no private right of action, Moffat v. Dep't of Corr., No. 14-cv-10082-RWZ, 2015 WL 4270161, at *5 (D. Mass. July 13, 2015); O'Neil v. Daimlerchrysler Corp., 538 F. Supp. 2d 304, 322 (D. Mass. 2008). As such, this Court lacks jurisdiction over such a claim and it must be dismissed.

### D. Qualified Immunity

Defendants assert that the affirmative defense of qualified immunity bars all of Peixoto's claims. D 15 at 13. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Such immunity is "immunity from suit" not

---

[4] Section 37 provides for punishment by fine or imprisonment for any person who "by force or threat of force, willfully injure[s], intimidate[s] or interfere[s] with, or attempt[s] to injure, intimidate or interfere with, or oppress[es] or threaten[s] any other person in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the commonwealth or by the constitution or laws of the United States."

merely immunity from liability for monetary damages.  Pearson v. Callahan, 555 U.S. 223, 231 (2009).

In determining whether a government official is entitled to qualified immunity, the Court considers:  (1) "whether the claimant has alleged the deprivation of an actual constitutional [or statutory] right"; (2) "whether the right was clearly established at the time of the alleged action or inaction"; and (3) "whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right."  Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001); see Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004) (establishing the First Circuit's practice of addressing the three factors sequentially).  Notably, the first factor encompasses denial of a federal statutory right, Mason v. Mass. Dep't of Envtl. Prot., 774 F. Supp. 2d 349, 372 (D. Mass. 2011), or a state statutory right, Bally v. Ne. Univ., 403 Mass. 713, 717 (1989).  Because qualified immunity is an affirmative defense, Defendants bear the burden of proving that the doctrine applies.  DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 35-36 (1st Cir. 2001).

As previously discussed, the Court concludes that Peixoto has sufficiently alleged violations of both § 1983 and the MCRA and the alleged constitutional right was clearly established at the time of Defendants' alleged misconduct.  See Ortiz v. Jordan, 562 U.S. 180, 191 (2011).  Where there is a question of fact as to whether the Defendants deprived or attempted to deprive him of his First Amendment right, there is, relatedly, also a question of fact as to whether an objectively reasonable person in the Defendants' position would have believed that their actions or inactions violated such rights.  See Morales v. Ramirez, 906 F.2d 784, 787 (1st Cir. 1990) (reasoning that "[e]ven assuming for the sake of discussion that the right . . . was 'clearly established' in the operative time frame . . . , our consideration here of whether 'a reasonable

official would [have] underst[oo]d that what he is doing violates' that right, . . . unavoidably calls into question whether *any* violation of the right occurred" (citation omitted) (alterations in original)). Thus, whether the Defendants are entitled to qualified immunity depends upon genuine disputes of material facts that cannot be resolved at this juncture. See Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 83 (1st Cir. 2006) (stating that "factual questions, to the extent they are antecedent to [the qualified immunity] determination, must be determined by a jury"). Defendants thus fail to show, at this stage, that they are entitled to qualified immunity.

## VI. Conclusion

For all of the foregoing reasons, the Court ALLOWS IN PART and DENIES IN PART Defendants' motion to dismiss, D. 14, as follows:

a. ALLOWS the motion as to the § 1983 claim against Silva and dismisses this claim without prejudice;

b. DENIES the motion as to the § 1983 claim against Russo and Smith in their individual and official capacities;

c. DENIES the motion as to the MCRA claim against Russo and Smith in their individual and official capacities; and

d. ALLOWS the motion as to any Mass. Gen. L. c. 265, §37 claim.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge